William E. SWINT, et al., Plaintiffs,

v.

**PROTECTIVE LIFE INSURANCE COMPANY, et al., Defendants.**

Civ. A. No. 89–0376–RV.

United States District Court, S.D. Alabama, S.D.

Nov. 8, 1991.

Nathan P. Friedlander, C.S. Chiepalich, Mobile, Ala., for William E. Swint, et al.

Joseph Babington, Warren Herlong, Mobile, Ala., for Protective Life Ins. Co.

John Richardson, Mobile, Ala., for Ward Intern. Trucks, Inc.

## ORDER

VOLLMER, District Judge.

Plaintiffs, William E. Swint and his wife, Louise Von Swint, as guardian and next friend of Roy Ivie (the "Swints"), brought this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and certain amendments made to ERISA by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), codified at 29 U.S.C. § 1161 *et seq.* Plaintiffs' complaints essentially emanate from the "termination" or "denial" by defendant Protective Life Insurance Company ("Protective Life") of health insurance coverage on Roy Ivie seven months following Roy Ivie's catastrophic injury in a September 1987, automobile collision. Beginning on March 2, 1987, said coverage was provided to Mr. Swint, as a full-time Ward employee, and to Mrs. Swint and Roy Ivie, as dependents of Mr. Swint, pursuant to a policy issued by defendant Protective Life through an employee welfare benefit plan (the "Plan") funded and sponsored by defendant Ward International Trucks, Inc. ("Ward"), the company by which Mr. Swint was employed.

More specifically, plaintiffs contend that Protective Life breached its fiduciary duties under ERISA when it made a determination to provide insurance coverage to Roy Ivie on the information it initially obtained and thereafter, on April 4, 1988, following further investigation into the coverage issue, "terminated" or "denied" additional payments to Roy Ivie under the aforementioned policy. Alternatively, plaintiffs contend that each defendant breached its fiduciary obligations under ERISA when it failed to recognize that Roy Ivie had made a COBRA election to continue coverage under the policy or when it failed, during Roy Ivie's incompetency, to make a COBRA election on his behalf.

Furthermore, the Swints maintain that each defendant violated either their ERISA fiduciary obligations or the COBRA amendments to ERISA when they failed, following Mr. Swints' notification to them of the occurrence of a qualifying event involving Roy Ivie, to inform Mr. Swint and/or Roy

Ivie of Roy Ivie's right to elect, and to elect on behalf of Roy Ivie, continuation coverage under COBRA. Finally and alternatively, plaintiffs assert that Protective Life should be estopped from asserting and/or deemed to have waived its right to deny coverage to Roy Ivie (1) due to its failure to make an adequate and timely inquiry into the issue of Roy Ivie's eligibility for dependant coverage until *after* the period for Roy to elect continuation coverage under COBRA apparently had lapsed, or (2) due to its own conduct in determining from the information received that coverage would be provided and, months later, avowedly prompted by documentation requirements imposed by its excess insurance carrier, revisited the coverage issue and determined that coverage, indeed, was not available.

A bench trial was held in this case on the liability issues only, commencing on Monday, July 22, 1991.[1] After due and proper consideration of the arguments of counsel, of all evidence presented by counsel, which evidence was not excluded by the court, of the agreed upon contentions of fact contained in the parties' joint "pretrial order" (*see* tab 61), and of the facts to which the parties stipulated, on the record, the first morning of trial, the court issues the following findings of fact and conclusions of law.

### Findings of Fact

A. The Principals

Defendant Ward International Trucks, Inc. ("Ward"), is a corporation, the principal place of business of which is located in Mobile, Alabama. As a local International Harvester Trucks franchisee, Ward is engaged in business in and affecting interstate commerce and, in fact, maintains an additional office in Pensacola, Florida. At all times material to this action, Ward employed approximately forty employees, including plaintiff William E. Swint.

Defendant Protective Life Insurance Company ("Protective Life") is an insurance business entity alleged to be organized and existing under Alabama law. Protective Life has its principal place of business in Birmingham, Alabama, and does business in Mobile County, Alabama.

In March 1987, Ward established an employee welfare benefit plan under ERISA. Ward funded this plan by applying for and purchasing a medical and life group insurance policy (the "Policy") from Protective Life. As will be discussed more fully hereinafter, the Policy, which no longer is in effect but which was implemented on March 1, 1987, and was in effect at all times material to this action, covered each Mobile-based, full-time Ward employee. Additionally, the Policy covered each full-time employee's eligible defendants for which the employee elected dependant coverage.

Alvin McPherson ("McPherson") is the independent insurance broker/agent who was hired by Ward in 1987 to "shop" for group insurance coverage for Ward. McPherson negotiated the purchase of the Policy by Ward from Protective Life and, in fact, later handled the process by which Ward enrolled its employees for coverage under the Policy.

John Sturdivant ("Sturdivant") is, and at all times material to this action was, the secretary/treasurer of Ward. In his capacity as secretary/treasurer, Sturdivant was involved in the enrollment of Ward employees in the group insurance program and handled disputes regarding the same.

Brenda Doss ("Doss") is, and was at all times material hereto, the office manager of Ward. As office manager, Doss was responsible for distributing insurance certificates to Ward employees, processing group insurance claims, and answering specific questions regarding coverage under the Policy.

Sue Sweatt ("Sweatt") was a claims examiner with Protective Life during the events made the basis of this suit. Sweatt processed the initial claims filed on Roy

---

**1.** The first morning of trial, the court informed the parties of its intention to conduct a bifurcated hearing in the case on the liability and damages issues, respectively. The court, to date, has received evidence only on the issues of liability.

Ivie's behalf against the Policy and was the first Protective Life employee with whom Ward employees had contact following Roy Ivie's accident.

Patrick West ("West") was an assistant manager and claims review examiner in Protective Life's group health claims department during the events made the basis of this suit. Following a routine review of and investigation into Roy Ivie's file, West made a determination on April 4, 1988, that Roy Ivie was *not* eligible for coverage under the Policy or for COBRA continuation coverage.

John Wright ("Wright") is, and was at all times during his involvement with this case, vice-president and senior associate counsel for, and a stockholder in, Protective Life Corporation, the parent corporation of Protective Life. Wright integrally was involved in making the April 4, 1988, determination that Roy Ivie was not eligible for coverage under the Policy or under COBRA.

The plaintiffs herein are William E. Swint and his wife, Louise Von Swint, as guardian and next friend of Roy Ivie. Mr. Swint, a fifty-four (54) year old man who has an eighth grade education, has been employed as a diesel engine mechanic by Ward since it was formed in May 1985. Roy Ivie is the natural child of Louise Von Swint and step-son of William E. Swint. Louise Von Swint was appointed legal guardian of Roy Ivie on December 18, 1987, by the Probate Court of Jackson County, Mississippi. Roy Ivie, who, as noted, was grievously injured in an automobile collision in September 1987, remained mentally incompetent from the date of the collision through the date of trial.

**B. Ward's ERISA Employee Welfare Benefit Plan and the Protective Life Policy**

As noted, effective March 1, 1987, Ward established an employee welfare benefit plan under ERISA, which plan was funded by Ward's purchase of the Policy from Protective Life.[2] Also, as noted, the Policy covered each full-time Ward employee and each employee's eligible dependents for which the employee elected dependent coverage. Under the express terms of the Policy, Ward paid one hundred percent (100%) of the group health insurance premiums for its full-time employees, and each employee was responsible for paying one hundred percent (100%) of the group health insurance premiums attributable to that employee's covered, eligible dependent(s).

The Policy, which consisted of the insurance certificate and riders and endorsements thereto, provided for various types of insurance coverage, including medical care insurance, for full-time employees and covered dependents. The overall maximum benefit for all covered charges under the medical care insurance provisions of the policy was one million dollars ($1,000,000.00).

Under the Policy, moreover, the filing of claims directly with Protective Life was prohibited; instead, the Policy instructed claimants to "give claims to Employer who will verify insurance status and file them with us."[3] The Policy, however, reserved to Protective Life responsibility for examining, processing, and paying all claims which *Protective Life* "decided" were payable thereunder and, further, states that "[n]o claim for benefits which are clearly ... outside the coverage of the Policy will be considered a valid claim."[4] Protective Life interpreted that provision of the Policy

---

**2.** The entire contractual relationship between Ward and Protective Life consisted of the Policy, including "any amendments, riders, or endorsements thereto," the insurance certificate, Ward's application for group insurance, and "the individual applications, if any, of the persons to be insured...."

**3.** Ward, in fact, was designated in the Policy as the "'named fiduciary' for claims review required by ERISA."

**4.** Brenda Doss testified that she "did not believe" that there was anyone at Ward who was responsible for determining if a person qualified as an "eligible dependent" of a covered employee. She further testified that when she received claims information, she sent the information directly to Protective Life.

as giving it the authority to make coverage eligibility determinations.

The insurance certificate, copies of which were distributed to each covered Ward employee, including Mr. Swint, consisted, *inter alia*, of a general description of persons who were eligible for health insurance coverage and of medical conditions and procedures for which coverage was available. Of relevance to the present action are those provisions which pertained to health insurance coverage for dependents of covered Ward employees.

In relevant part, the insurance certificate defined the term "eligible dependent" for purposes of medical care insurance to include an unmarried child who is "age 19 but under age 24 years, if the child (1) *attends school full-time and* (2) depends on you for more than one half of his or her support; ..."[5] A child, moreover, was defined as including "a step-child who lives with the employee in a regular parent-child relationship and for whom the employee (or the employee's spouse who lives with the employee) has permanent legal custody."

Significantly, the group health certificate in question *did not* define what was meant by the term "attends school full-time," and Protective Life's claims department did not maintain any written guidelines to assist in interpreting that provision of the Policy. Instead, it was Protective Life's Policy to defer to the involved school's policy to determine whether a particular dependent was attending school full-time.[6]

With respect to the termination of dependent coverage, the Policy generally provided that health insurance coverage would end on the date that a dependent ceased to be eligible. The Policy, however, did offer conversion coverage,[7] as well as COBRA continuation coverage, to dependents who no longer were eligible for coverage under the Policy. Although the conversion option was described in detail in the Insurance Certificate, the COBRA continuation privileges were described in an endorsement to the Policy (the "COBRA endorsement").

The COBRA endorsement provided continuation coverage to, among others, an employee's child whose eligibility as a dependent under the Policy had ceased. The COBRA endorsement required either the employee or the dependent to notify the "ERISA plan administrator" of the occurrence of an event which caused the dependent not to qualify for coverage under the Plan. Nowhere in the endorsement, however, was the ERISA plan administrator identified.[8] The COBRA endorsement, moreover, *did not* specify the manner in which the notice had to be given (that is, either in writing or orally) and did not set forth the period of time in which the notice had to be given.

---

5. All eligible defendants under the Protective Life Policy were covered under the so-called "contributory plan." Under the Policy, in order to insure an eligible dependent, a covered employee had to fill out and sign an enrollment card and, give the card to Ward.

6. Much evidence was presented at trial concerning what was meant by the term "attends school full-time." Almost everyone who testified, the attorneys for all parties, and the court, however, used the terms "attends school full-time" and full-time student" interchangeably as though the terms were synonymous.

    Wright testified that, in his opinion, the words "attends school full-time" were not ambiguous. Nearly every witness who testified, including Johnnye Taylor, who served as a high school guidance counselor for over 40 years, however, had a different idea about what the term meant. The term, in the court's opinion, is ambiguous as set forth in the Policy.

7. In the body of the Insurance Certificate that was distributed to all full-time Ward employees, conditions were enumerated for securing conversion coverage by former eligible dependents. Those conditions, which required, *inter alia*, written notification to Protective Life of the termination of a dependent's eligibility within thirty-one (31) days of the terminating event, appear to conflict with the requirements of COBRA. John Wright, in-house counsel for Protective Life, testified, however, that the provisions in the Certificate relating to conversion privileges are mandated by state law.

8. In fact, with respect to qualifying events for which the employee had no initial notification duties, the endorsement stated that "[t]he employer is required to notify the ERISA plan administrator: of those events. That language would seem to suggest that the employer and the ERISA plan administrator were *not* identical.

Under the terms of the COBRA endorsement, the ERISA plan administrator had to give qualified persons notice of their continuation rights within 14 days after receipt of the notice of the occurrence of a dependent's loss of eligibility for coverage under the Policy. Once that notice was given, an election for continuation coverage had to be made within 60 days after the later of (1) the qualifying event; or (2) "the date the employee or dependent is advised by the ERISA plan administrator of the right to continued coverage." The endorsement did not require or refer to a "written election," nor did the endorsement state that the qualified beneficiary had to make the election.[9]

In addition to the foregoing, the Policy required that for unscheduled and emergency hospital admissions, a phone call should be made to Protective Life before the end of the next working day after the admission to a hospital to certify the admission for full coverage benefits under the Policy. The Policy further stated that "[j]ust because a Hospital admission is Certified does not mean that all charges incurred will be Covered Charges or that benefits will be payable for all Covered Charged incurred. All other terms, limits, and exclusions of the Policy still apply.

### C. The Events Preceding the Accident

In early 1987, Ward hired independent insurance agent/broker McPherson to "shop" for a group insurance plan for Ward. McPherson's efforts culminated in Ward's purchase of the Policy from Protective Life.

On March 2, 1987, following the purchase of the Policy by Ward and, in fact, following the effective date (March 1) of the Policy, McPherson met individually with Ward's Mobile, Alabama, employees to explain to them the benefits available under the Policy, to differentiate between benefits available under that policy versus Ward's previous policy, and to resolve any questions that the employees might have pertaining to coverage. Plaintiff William E. Swint was among the Ward employees with whom McPherson met.

McPherson, in fact, spoke with Mr. Swint on two occasions, once on March 2 and, again, the following day. During their initial meeting, Mr. Swint inquired as to whether Mr. Swint's stepson, Roy Ivie, could be covered under the Policy and, if so, for what period of time. It was McPherson's recollection that, at that time, he essentially informed Mr. Swint that Roy Ivie would be covered at least until Roy Ivie turned nineteen (19) years old, unless thereafter and continuing until his twenty-third or twenty-fifth birthday, Roy Ivie remained a "full-time"[10] student. McPherson further told Mr. Swint that he (McPherson) would have to check with Protective Life to verify that information.[11] Following that meeting, Mr. Swint filled-out an insurance enrollment card, listing thereon his wife, Louise Von Swint, and two sons, Robert Edward Swint and Roy Ivie, as dependents.[12]

---

9. The endorsement, which contained a number of other explanations regarding COBRA continuation rights, none of which was directly relevant to this case, provided that the "provisions will become effective on the first anniversary date of the plan which occurs on or after July 1, 1986." The endorsement, however incorrectly stated that the anniversary date was shown in the Policy. It is not clear from the documents in this case whether COBRA applied to the Policy. Wright testified, however, that he believed that COBRA generally did apply and, in fact, everyone acted as though it did so.

10. Although McPherson did not recollect using the word "full-time," he expects that he would have used said terminology. Mr. Swint had no recollection of the terminology used by McPherson.

11. McPherson did not recall discussing anything further with Mr. Swint during that meeting. Specifically, McPherson testified that he did not recall discussing Roy Ivie's COBRA continuation rights with Mr. Swint.

12. Actually, McPherson testified that both he and Protective Life filled-out certain preliminary information on the enrollment card, while Mr. Swint provided the balance of the information, including material relative to dependent coverage. The enrollment card, which contains the names and birthdates of Mr. Swint's dependents, does not reflect that Roy Ivie, in fact, was Mr. Swint's step-son, rather than his natural child.

As will be discussed, moreover, it appears that Mr. Swint did not have a copy of, or access to, an insurance certificate which enumerated the

The following day, McPherson, while at Ward, briefly met with Mr. Swint to verify the information that McPherson previously had conveyed to Mr. Swint. Essentially, McPherson, after consulting with a representative of Protective Life, confirmed to Mr. Swint that Roy Ivie would be covered at least until Roy Ivie turned nineteen (19) years old, unless thereafter and continuing until his twenty-fourth birthday Roy Ivie remained a full-time student.

The group insurance certificates, certificate declarations, and certificate riders and endorsements were sent to Ward by Protective Life in mid-May 1987.[13] Copies of a COBRA continuation notice additionally were forwarded to Ward,[14] although conflicting testimony was presented as to who provided those notices and when the notices were provided.[15]

After receiving the aforesaid documents, Sturdivant directed Doss and Ward's receptionist to distribute the materials to Ward's employees. Prior to distributing the certificates, Doss placed a copy of the COBRA continuation endorsement, as well as a current "physicians' list," with each certificate,[16] which the receptionist then twice stapled to the inside front cover of each certificate. On the outside front cover of each certificate the receptionist wrote the name of the Ward employee to whom the certificate was to be given. Thereafter, Doss hand-distributed the certificates to each employee, including Mr. Swint. Mr. Swint acknowledged receiving a certificate from Doss, which had appended to it a new physicians' list, but denied receiving a copy of the COBRA continuation endorsement.[17] At no time were Ward employees given a summary description of any kind of benefits available to them under the Policy.

After receiving an insurance certificate, Mr. Swint took the certificate home and, a few days later, reviewed portions of it with his wife, Louise Von Swint. Mr. Swint,

conditions for a dependent's eligibility under the Policy at the time he completed the enrollment card. Mr. Swint never was given a summary description of benefits available under the Policy, and it was nearly two months *after* Mr. Swint enrolled himself and his dependents for coverage that Mr. Swint was provided with an insurance certificate/booklet, containing detailed information about benefits available under the Policy.

13. Plaintiffs' exhibit 30 is a copy of the cover memorandum, dated May 14, 1987, which was included with the insurance certificates. As evidenced by plaintiffs' exhibit 29, the Master Policy was mailed to Ward on or about May 20, 1987.

14. The document, entitled "IMPORTANT NOTICE: CONTINUATION OF GROUP HEALTH COVERAGE FOR QUALIFIED PERSONS," was introduced into evidence as Plaintiffs' exhibit 27 and Defendants' exhibit 59. It is important to distinguish the notice from the COBRA endorsement. The notice, in contrast to the endorsement, was a more or less accurate and comprehensive statement of insurance continuation rights available under COBRA.

15. McPherson testified that he probably gave Ward information regarding COBRA, perhaps even copies of the COBRA continuation notice. His testimony was consistent with Doss's recollection that she distributed said notices to all Ward employees in early March 1987, by stapling copies of the same to each employee's paycheck. Doss, in fact, quite remarkably recollected stapling a copy of the COBRA continuation notice to Mr. Swint's paycheck!

16. Doss could not recall from whom Ward received the COBRA continuation notice which she placed with each insurance certificate. Doss did testify, however, that she had received a COBRA notice from McPherson.

17. The original certificate provided to Mr. Swint, on which was written Mr. Swint's name, was introduced into evidence. *See* Defendant Ward's Exhibit 1. Consistent with Doss's testimony, the certificate has two staple holes in the upper right-hand front corner. At the time of trial, however, the documents which allegedly had been appended to the certificate were not attached.

At the beginning of trial, Protective Life introduced its exhibit 23, a copy of the Insurance Certificate which Ward distributed to its employees. Conveniently, the COBRA endorsement was *not* appended to the Certificate, allegedly due to an "oversight" in copying. The absence of the endorsement initially was confused to the court, since it seemed from early testimony that it was the "IMPORTANT NOTICE: CONTINUATION OF GROUP HEALTH COVERAGE FOR QUALIFIED PERSONS," and not the more ambiguous endorsement, that was appended to the Certificates prior to distribution of those certificates to Ward's employees. Toward the end of the trial, the court allowed Protective Life to introduce as exhibits 69, 70 and 71, a copy of the Certificate, with an attached COBRA endorsement.

additionally, removed the physicians' list from the front inside cover of the certificate and gave the list to Mrs. Swint.[18] Notwithstanding their general familiarity, garnered from Mr. Swint's conversations with McPherson, with coverage provided under the Policy, the Swints read portions of the certificate, including that which pertained to the availability of coverage for eligible dependents.

At the time during which Ward was undergoing the transition from its former insurer to Protective Life, Roy Ivie, then eighteen years old, was enrolled in his senior year at George County High School in Lucedale, Mississippi. Originally, Roy Ivie was scheduled to graduate in May 1987; however, he did not do so because of his failure to pass an American History course during the previous school year.

In an effort to make-up the failed history course, Roy Ivie enrolled in an independent study correspondence course in American History on August 22, 1986, through the Division of Lifelong Learning of The University of Southern Mississippi. Roy Ivie never completed any written work assignments or tests as part of the course or physically attended class. He, however, requested two extensions of time in which to complete the requirements for receiving course credit, ultimately being permitted until March 22, 1988, to complete his assignments.

Because he did not graduate in May 1987, Roy Ivie's high school records were placed with those of the school's 1987–88 senior class. At that point, Robert Walker, principal of George County High School, still considered Roy Ivie to be a student, even though the school did not have an official policy at that time which made a distinction between "active" versus "inactive," or "part-time" versus "full-time," students. Roy Ivie did not physically attend classes at the high school after May 1987.

In September 1987, when classes resumed at the high school, Roy Ivie's name did not appear on the school's student register or on any class grade or attendance registers, the school did not maintain a student card on him, and the school did not receive any attendance funds from the state of Mississippi attributable to him. Because of his enrollment in the correspondence course, however, Roy Ivie was eligible, during the 1987–88 school year, for school guidance counseling and to participate in school activities.

During the 1985–86 and 1986–67 school years, Roy Ivie participated in a work cooperative program, through which he was able to earn school course credit while working part-time at Bellbro Auto Parts store ("Bellbro"). At the end of the 1986–87 school year, Roy Ivie began working for Bellbro full-time, earning $175.00 per week. As a full-time employee, Roy Ivie was eligible for coverage under Bellbro's group health insurance policy.

John Andrews, Roy Ivie's supervisor at Bellbro, in fact, offered Roy Ivie the option of purchasing health insurance through the store's group policy. Roy Ivie declined to do so, however, because he could not afford the coverage and because he already was covered under Mr. Swint's policy. Roy Ivie told Andrews that he would purchase coverage under the Bellbro policy once he no longer was eligible for coverage under his father's policy.

The Swints testified that they were aware that Roy Ivie did not graduate in May 1987. They further testified, however, that Roy Ivie told each of them that he would "make things up" to them. Although Mr. Swint was aware that Roy Ivie had enrolled in a correspondence course, Mrs. Swint was not thus informed.

Roy Ivie turned nineteen years old on August 4, 1987. As of that date, Roy Ivie, as noted, was enrolled in an American History correspondence course and was working fifty hours per week at Bellbro. Roy Ivie remained listed as an eligible dependent on Mr. Swint's insurance enrollment card. Moreover, neither Roy Ivie nor Mr. Swint specially notified either Ward or Protective Life of the occurrence of Roy Ivie's nineteenth birthday prior to Roy Ivie's acci-

18. By the time Mrs. Swint reviewed the certificate, there were no documents appended to it.

dent. At the time of and following his birthday, Roy Ivie resided with the Swints and received more than one half of his support from them.

## D. The Accident and the Aftermath

On Friday, September 18, 1987, forty-five days after Roy Ivie's birthday, Roy Ivie was catastrophically injured in an automobile collision. Roy Ivie, who was rendered comatose in the accident, immediately was taken to the Mobile Infirmary in Mobile, Alabama, for treatment.

On Monday morning, September 21, 1987, forty-eight days after Roy Ivie's nineteenth birthday, Mr. Swint reported to work and told Doss about the accident and where Roy Ivie then was hospitalized. Doss' initial concern was with making sure that Roy Ivie had been assigned a preadmission certification number. According to Doss, no questions concerning Roy Ivie's age and student status arose during that conversation.

After speaking with Mr. Swint, Doss conferred with Sturdivant. Doss told Sturdivant about the accident and, further, told him that she would verify that a preadmission certification number had been issued by the admitting hospital.

Doss then called Sweatt at Protective Life to find out if anything else needed to be done. Sweatt, who, at the time of this initial notification, had not received any claims for benefits attributable to Roy Ivie's accident, told Doss that there was nothing further to be done at that point.

Doss thereafter again conferred with Sturdivant, who directed Doss to determine Roy Ivie's age and whether Roy Ivie still was in school.[19] At that point, Doss was aware of Roy Ivie's age, having pulled Mr. Swint's Policy enrollment card earlier that morning.

Doss again met with Mr. Swint, whom she asked if Roy Ivie was "still in school."[20] Mr. Swint replied by saying that Roy Ivie had not passed the twelfth grade but had enrolled in a course to graduate.[21] Mr. Swint did not tell Doss, and Doss did not ask, whether Roy Ivie was enrolled in a correspondence course.[22] Doss conveyed Mr. Swint's reply to Sturdivant.

On September 30, 1987, the fifty-seventh day following Roy Ivie's nineteenth birthday, Doss met with Mr. Swint for the purpose of having Mr. Swint complete a claims form for group medical insurance benefits. Portions of the "employee's statement" on the form were completed by Ward's receptionist, based on information derived from Mr. Swint's Policy enrollment card. Mr. Swint signed the form, even though that portion of the form which requested information on Roy Ivie's student status was not complete and notwithstanding the fact that Roy Ivie's birthdate was incorrectly designated as being August 4, *1986*. Doss completed the "employer's statement" portion of the form, indicating thereon that

19. Sturdivant testified that he "probably" talked with Doss about COBRA, although he also testified that in September 1987, he believed that employee termination was the only event which qualified an employee or an employee's dependents to make an election under COBRA.

20. Doss testified that she did *not* ask Mr. Swint whether, at the time of the accident, Roy was residing with the Swints and received over one half of his support from them. Moreover, no one at Protective Life ever questioned Mr. Swint about that circumstance.

21. Conflicting evidence was presented regarding *the exact words Doss used in inquiring about Roy Ivie's student status* and the words that Mr. Swint used in response. After carefully reviewing all of the relevant evidence, and making appropriate credibility determinations as factfinder, the court concludes that neither Doss nor Mr. Swint used the terms "full-time student" or "attends school full-time." The court further concludes that Mr. Swint did not intentionally misrepresent his son's student status to Ward or, subsequently, to Protective Life. The court's determination renders MOOT plaintiffs' argument that a determination by this court on the misrepresentation issue, at least as to defendant Protective Life, is barred by the doctrine of collateral estoppel.

22. At the time Mr. Swint first informed Doss about Roy's student status, Mr. Swint knew that Roy was enrolled in a correspondence class, knew that Roy was not physically attending class, and knew that Roy had worked full time during August and September.

Roy Ivie was covered under the Policy as a dependent and, further, that Roy Ivie's coverage currently was in force.[23]

Within days following Roy Ivie's accident, McPherson, on one of his routine visits to Ward, met with Sturdivant and Doss to discuss Roy Ivie's condition. During their conversation, the focus of which was on whether Roy Ivie properly had been certified for hospital admission, the subject of Roy Ivie's age was mentioned. The three, in fact, discussed the fact that Roy Ivie's age could terminate coverage and also discussed the impact that Roy Ivie's school status could have on Roy Ivie's coverage.[24]

The three also discussed Roy Ivie's right to receive notice of his right to elect COBRA continuation coverage. McPherson suggested to Sturdivant and Doss that they determine Roy Ivie's student status. He further reminded Sturdivant and Doss that if Roy Ivie was not a full-time student, then Roy Ivie would be entitled to receive a COBRA election notice.

McPherson subsequently met with Sturdivant and Doss on several of his routine visits to Ward. During one of those visits, the three discussed the fact that Sturdivant and Doss had determined that Roy Ivie, indeed, was a full-time student at the time of the accident. Upon learning of that determination, McPherson advised Sturdivant and Doss not to give Roy Ivie notice of his right to elect COBRA continuation coverage, since Roy Ivie's status as a full-time student extended his insurance coverage under the Policy.

The first group of medical providers' claims attributable to Roy Ivie's accident was sent to Protective Life by Ward on or about September 30, 1987, but was not received by Sweatt until approximately October 12, 1987, the sixty-ninth day following Roy Ivie's accident. Sweatt testified that that group of claims was the first

written documentation of Roy Ivie's accident that she received and noted that she had not made a record of her initial conversation with Doss. Doss subsequently forwarded several claims to Sweatt in November, December, and January.

Sometime in mid-November, Sweatt, after noting that Roy Ivie's student status had not been indicated on the initial claims form from Ward and needing to verify coverage to George County Hospital, the medical institution to which Roy Ivie was to be transferred, contacted Doss to find out if Roy Ivie was then attending school full-time at the time of his accident. Although Sweatt could not recall the specifics of her conversation with Doss, a "telephone call documentation" signed by Sweatt and dated November 13, 1987, stated that "Roy failed 12th grade last year. He was already enrolled to complete his 12th year in high school when the accident happened." Sweatt testified that the information contained on that "documentation" was obtained by her from Doss.

After speaking with Doss, Sweatt called Debra Dixon, an administrator at George County Hospital, and informed her that Protective Life would need to receive a completed repayment agreement before it could commence processing insurance claims. Sweatt further stated that, based on information Protective Life obtained from Ward, Roy Ivie was a full-time student at the time of his accident and, therefore, was covered under the Policy.

Protective Life received a "repayment agreement," executed by Mr. Swint on Roy Ivie's behalf, from Ward on November 19, 1987. Thereafter, on or about December 1, 1987, Sweatt again contacted Doss to confirm Roy Ivie's student status. An undated "telephone call documentation" executed by Sweatt reflects that Doss told Sweatt that "Roy was enrolled for his senior year in high school when the accident

---

**23.** Doss testified that she sent the form, probably with medical providers' claims attached thereto, to Protective Life for processing. Documents introduced at trial reflect that on subsequent occasions when Doss received providers' claims, she attached those claims to a form on which only the "employer's statement" was completed, and then forwarded the claims and the form to Protective Life for processing.

**24.** None of the testimony offered at trial indicated that McPherson was an agent of, or conduit for information to, Protective Life.

happened." Sweatt began paying claims attributable to Roy Ivie's accident on December 2, 1987.[25]

West became involved with Roy Ivie's file in early January 1988. At the time of his initial involvement, West was conducting a routine review of insurance files, including Roy Ivie's, which indicated "large" claims. Because those files, according to West, most likely were going to be sent to Protective Life's reinsurance carrier, West needed to be sure that the files included all documentation that was necessary to coverage under Protective Life's reinsurance policy.

Upon reviewing the file, West noted the absence of a written verification of Roy Ivie's student status. Knowing that Protective Life's reinsurance carrier would require such a verification, West directed Sweatt to contact Ward for the purpose of obtaining such verification.[26]

Pursuant to West's directive, Sweatt, in an undocumented conversation, called Doss and asked her to obtain a written verification of Roy Ivie's student status. Doss, in turn, asked Mr. Swint to obtain the necessary document.

Ultimately, Mrs. Swint went to George County High School to obtain the written verification. While at the school, Mrs. Swint met with Mrs. Johnnye Taylor, the school's guidance counselor, who agreed to prepare a written verification of Roy Ivie's student status. Taylor, in fact, authored a letter dated January 21, 1988, signed by Taylor, as Counselor, and Walker, as Principal, of George County High School, which stated the following:

To Whom It May Concern:

This is to verify that Roy E. Ivie is currently enrolled in a correspondence class at the University of Southern Mis-

sissippi, Hattiesburg, Mississippi and upon its completion, Roy will be eligible for graduation.

He enrolled in American History August 1986.

Mr. Swint promptly delivered the letter to Doss, who then forwarded the letter to Sweatt. Sweatt received the letter on January 26, 1988.

Believing the January 21 letter to be inconsistent with the information that Protective Life previously had obtained from Doss concerning Roy Ivie's student status, Sweatt called Taylor on February 1, 1988.[27] A "telephone call documentation" executed by Sweatt reflects that Sweatt asked Taylor if Roy Ivie was "enrolled as a full-time student in September 1987." Taylor responded by saying that "Roy was enrolled for his senior year in September 1987 and was attending school full-time." Sweatt thereafter reported her conversation with Taylor to West and gave West a copy of Taylor's January 21 letter.

At some time subsequent to Protective Life's receipt of Taylor's January 21 letter, but prior to March 2, 1988, West conferred with Wright about Roy Ivie's file. Wright reviewed Roy Ivie's file, which had been provided to him by West, and determined what Protective Life needed to do in order to complete their investigation of Roy Ivie's student status.

After conferring with Wright, West called Sturdivant to ask Sturdivant if Ward thought Roy Ivie was a "full-time" student. Although West generally recalled talking with Sturdivant about COBRA and being told by Sturdivant that Mr. Swint was given a COBRA continuation notice when he enrolled in the Plan, West could not recall whether he and Sturdivant discussed

---

**25.** No question ever arose with Sweatt regarding Roy Ivie's potential COBRA rights; according to her, that was not in her "line of responsibility."

**26.** Sweatt and Wright testified that up until the point at which West reviewed Roy Ivie's file for reinsurance purposes, Protective Life was satisfied that Roy Ivie was a full-time student at the time of his accident and thus eligible for coverage under the Policy.

**27.** Actually, prior to their February 1 conversation, Sweatt had tried a number of times, commencing on January 27 to contact Taylor. Protective Life continued to pay claims on Roy Ivie's account after receiving Taylor's January 21 letter and following Sweatt's February 1 conversation with Taylor.

whether Roy Ivie should have been given a COBRA continuation notice.

In addition to recalling speaking with West, Sturdivant was contacted by Edward Zeviernik, Jr., head of Protective Life's customer service department, in February 1988. Zeviernik, who also questioned Sturdivant about Ward's position on Roy Ivie's student status, testified that Sturdivant asked him for information on COBRA. Sturdivant told Zeviernik that he (Sturdivant) thought that Roy Ivie's accident occurred during a "grey area" under COBRA and suggested that Protective Life consider that fact in assessing Roy Ivie's eligibility for insurance coverage. It was Zeviernik's position with Sturdivant that *Protective Life* was to determine whether COBRA applied to Roy Ivie's case. Wright testified that Zeviernik may have relayed to him Sturdivant's suggestion regarding the applicability of COBRA.

On February 23, 1988, West, confronted with apparent conflicting information, wrote directly to Taylor, requesting clarification of the information Protective Life had received from her regarding Roy Ivie's student status. In pertinent part, the letter stated as follows:

Based on the information you advised Sue Sweatt during your telephone conversation [of February 1], there seems to be a discrepancy or some confusion on our part concerning the status of Roy Ivie on the date of his injury during September, 1987.

I have attached a copy of your letter to Protective Life dated January 21, 1988 for your convenience. Within this letter you advised us that our Insured was enrolled in a correspondence class at the University of Southern Mississippi, Hattiesburg, Mississippi. You also advised us that he was enrolled in American history during August of 1986. We wish for your to advise us if he was considered a full-time student at George County High School.

\* \* \* \* \* \*

Taylor and Walker responded to West's letter by letter dated March 2, 1988. In their letter, which appears to have been received by Protective Life on March 8, 1988, Taylor and Walker, in pertinent part, stated as follows:

Our records show that [Roy Ivie's] last physical attendance at this school was May 1987 at which time he was scheduled to graduate. Because of credit and/or course deficiencies he could not graduate and was advised to take correspondence at the University of Southern Mississippi. When this was done, his diploma would be issued to him. He, therefore, was not in physical attendance at this school September 1987 and was not a part-time nor full-time student here.

With reference to his enrollment in American History in 1986, yes, he was enrolled in this course at this time because it is a requirement for graduation. He passed the first semester but failed the second semester credit and therefore was responsible for completing this requirement. This was the basis of the correspondence course.

After receiving the aforesaid letter, West wrote a fill-in-the-blank letter to the Swints, on March 15, 1988, requesting Mr. Swint to provide more detailed information on Roy Ivie's student status. The letter, in pertinent part, read as follows:

We have been advised that your dependent, Roy Ivie, was not a full-time student at George County High School during September 1987. We wish for you to advise and verify the following information (Please check or complete as needed):

Was Roy Ivie enrolled as a full-time student in September, 1987 at George County High School? _____ YES _____ NO

Was Roy Ivie enrolled in any educational institution during September, 1987? _____ YES _____ NO

If yes, please give name and address of institution:

\* \* \* \* \* \*

Mrs. Swint assisted Mr. Swint in completing the questionnaire/letter by filling in the relevant information. Mr. Swint thereafter

signed the letter on March 19, 1988, thereby attesting to the truthfulness and accuracy of the information contained therein.

In response to the first question quoted above, the Swints did not simply answer "yes" or "no." Instead, they wrote the following explanation: "Roy Ivie was enrolled in George County High School with the course or courses to graduate in May of 1988. He was a member of *DECA* or called a co-op class. He went to school and also worked." To the second above-quoted question, the Swints answered in the affirmative, noting thereafter that Roy Ivie "was enrolled in Division of Life–Long Learning at University Southern Mississippi in Hattiesburg, Mississippi." [28]

No claims were paid by Protective Life after Protective Life received the completed letter. In fact, March 2, 1988, is the last date on which any claims were paid.

In addition to the sending the foregoing letter to the Swints, West directed Sweatt to contact Mrs. Larry Ladner, Office Supervisor of the Independent Study Office of The University of Southern Mississippi's Division of Lifelong Learning, presumably to confirm Roy Ivie's enrollment in a correspondence course. Sweatt spoke with Ladner on or about March 28, 1988, and, the following day requested written confirmation from Ladner of the contents of their telephone conversation. By letter dated April 6, 1988, and received by Protective Life on April 11, 1988, Ladner informed Sweatt of the following:

> Roy E. Ivie, Rt. 8, Box 485 A, Lucedale, MS 39452, SS # 587–45–9740, registered in Independent Study course American History, 1st Semester for ½ credit. The fee pari was $53.00 for the tuition only. His registration date was August 22, 1986. From that date forward, no mate-

rials from the student or tests from the supervisor were ever received. He requested and was granted two time extensions which allowed his additional time until March 22, 1988. During that time and as of this date, no materials or tests have been received.

Sweatt forwarded Ladner's letter to West.

Armed with all of the foregoing information except, perhaps, Ladner's written confirmation of her March 28, 1988, telephone conversation with Sweatt, West, Wright, and all remaining members of the group health claims department, including Charles Gardner, second vice president of group administration, who was uniquely familiar with the requirements of COBRA,[29] convened a meeting in late March to discuss Roy Ivie's case. The meeting, which was attended by "eight to ten people," did not include any Ward employees. In fact, no one at Ward was notified that the meeting was going to occur or had occurred.

Among other matters discussed were the issues of whether an "initial COBRA notice had been sent" and whether Roy Ivie had made a COBRA election.[30] Those present were advised that a COBRA election had not been made. Further, West advised Wright that he (West) previously had contacted Sturdivant, who advised that a COBRA notice had been given to all Ward employees shortly after the effective date of the Policy.

Ultimately, it was determined at the meeting that a COBRA election had not been made, that Roy Ivie was not a full-time student at the time of his accident, and that Roy Ivie was not eligible for coverage under the Policy. Those present at the meeting discussed Protective Life's next course of action. It was determined

---

**28.** The Swints each testified that at the time they completed the letter, they believed the information contained therein to be true.

**29.** Gardner testified that one had to complete a COBRA election form under Protective Life's policy in a timely fashion under Federal law to be eligible *to receive continuation coverage.* Gardner further testified that a phone call from a group employer's insurance clerk to Protective Life saying, in substance, that "a dependent who

no longer is eligible for coverage and who has been in an accident needs insurance," is not a sufficient election.

**30.** At the time of the meeting, Wright knew that there might be a problem if the initial COBRA notice had not been given; that is, he knew that there might be a problem, but not necessarily for Protective Life.

that West should notify the Swints about Protective Life's decision.

Following the meeting, West, by letter dated April 4, 1988, informed the Swints of Protective Life's determination concerning Roy Ivie's ineligibility for benefits under the Policy. In pertinent part, the letter stated as follows:

> After a review of information recently submitted to Protective Life, we have determined that claims have been processed by Protective Life in error. Based on incorrect information given by you to your employer, ..., we processed charges that were not in accordance with the group insurance policy.
>
> \* \* \* \* \* \*
>
> Due to the fact that Protective Life was mislead and given inaccurate information, we processed and paid charges that were not covered under the terms and conditions of the group insurance policy issued to your employer,.... We acted in good faith believing that your stepson, Roy Ivie, was eligible for coverage.
>
> \* \* \* \* \* \*
>
> According to recently received information, your step-son, Roy Ivie, was not a full-time student, as defined within the terms of the group insurance policy, therefore his coverage terminated on his 19th birthday which was August 4, 1987. All charges incurred by Roy Ivie on or after that date are not covered under this group insurance policy.
>
> The benefits paid to date total $80,329.29. Protective Life is due to have this amount refunded to it unless our latest information concerning your stepson's status is inaccurate.
>
> \* \* \* \* \* \*

If you feel that this determination of your step-son's eligibility has been determined improperly, we will be glad to consider any additional information you wish to submit.[31]

Also, on April 4, 1988, West sent letters to at least twenty medical care providers who previously had rendered services to Roy Ivie and to whom benefits had been paid by Protective Life. In those letters, West essentially conveyed information similar to that which was contained in West's April 4 letter to Mr. Swint and requested reimbursement of all benefits received by them from Protective Life. Similar letters were sent to medical care providers who submitted bills for payment by Protective Life after April 4, 1988, but to whom medical benefits had not been paid by Protective Life.[32]

Upon learning of the denial of coverage for Roy Ivie under the Policy, Mr. Swint met with Sturdivant. Sturdivant advised Mr. Swint that there was nothing that he (Sturdivant) could do and suggested that Mr. Swint contact an attorney.

Sturdivant distributed an interoffice memorandum dated April 28, 1988, to all Ward employees, encouraging them to re-familiarize themselves with their COBRA rights. Appended to that memorandum was a copy of the "IMPORTANT NOTICE: CONTINUATION OF GROUP HEALTH COVERAGE FOR QUALIFIED PERSONS."

At no time did Ward give Mr. Swint any other notice indicating that Roy Ivie had any continuation rights under COBRA. In fact, Mr. Swint testified that when he received Ward's April 28 memorandum, he did not know that the COBRA law applied to Roy Ivie. The Swints testified that they have been ready and willing, at all times

---

**31.** Wright testified that nothing was said regarding COBRA in the letter because the COBRA election period "had expired."

**32.** As noted, *supra* page 536, it was West who ultimately determined that Roy Ivie was not eligible for coverage under the Policy and had not elected COBRA continuation coverage. West made the latter determination simply by contacting someone in Protective Life's custom-

er service department, who informed West that a COBRA election had not been made.

West essentially testified that as of September 1987, he was generally aware of the fact that dependents could elect COBRA continuation coverage, but did not know what a dependent had to do in order to make such an election. West, moreover, did not know if Protective Life had any written guidelines for the making of a COBRA election.

since the accident, to make a COBRA election on Roy Ivie's behalf.[33]

Concurrent with the Spring 1988 controversy over Roy Ivie's eligibility for insurance coverage, other events relevant to this action were occurring. In December 1987, Jim Duke, a medical review coordinator for Protective Life, began evaluating Roy Ivie's progress to determine if and where Roy Ivie should be placed for rehabilitation therapy. In February 1988, Duke contacted Paula Wade, a registered nurse and rehabilitation coordinator with Continental Rehabilitation Resources, essentially to obtain Wade's recommendation on an appropriate rehabilitation program for Roy Ivie.

In mid-February 1988, Duke called Mrs. Swint to make her aware, and gain her approval, of Wade's involvement with Roy Ivie's case. Duke, who at the time understood Roy Ivie to have insurance coverage, told Mrs. Swint not to worry, that Protective Life would "stand behind" them. He also told Mrs. Swint about an extended rehabilitation policy offered by Protective Life, called the "ROSE," and promised to send her information regarding that policy.

Subsequently, Wade and Duke determined that Roy Ivie should be placed in an intensive rehabilitation facility located in Birmingham, Alabama. The Swints met with Wade on at least one occasion to talk with her about the facility. In late March or early April 1988, the Swints made preparations to move Roy Ivie to the new facility; however, on the eve of the planned move, one of Roy Ivie's doctors cancelled the transfer plans. Shortly thereafter, the Swints received West's notification to them of Roy Ivie's ineligibility for coverage under the Policy.

### Conclusions of Law [34]

This essentially is an action brought by an ERISA–governed employee welfare benefit plan participant and beneficiary to enforce the beneficiary's rights and recover benefits allegedly due to the beneficiary under the terms of a group health policy and to clarify the beneficiary's right to future benefits under the terms of that Policy. To facilitate an understanding of the court's analysis and ultimate conclusions, a brief description of plaintiffs' claims and of the factual underpinnings of those claims is necessary. Furthermore, a brief explanation of the statutory scheme of ERISA and the COBRA amendments thereto will provide a useful context for the court's analysis.

### A. Contentions of the Plaintiffs

As noted, plaintiffs' complaints emanate from the "termination" or "denial" by Protective Life of health insurance coverage on Roy Ivie on April 4, 1988, after Protective Life determined that their excess insurance carrier would be involved in the loss which resulted from Roy Ivie's catastrophic injury in an automobile collision. Plaintiffs' claims are three-fold: First, plaintiffs contend that Protective Life and Ward, each of which allegedly had fiduciary obligations under ERISA, breached their duties, thereby damaging the plaintiffs. Specifically, plaintiffs contend that Protective Life, by "terminating" or "denying" coverage to Roy Ivie under the Policy or, alternatively, each defendant, by failing to recognize that Roy Ivie had made a COBRA election to continue coverage under the Policy, breached their fiduciary duties under ERISA.[35] In response to this claim, defendants primarily contend that they had no fiduciary obligations to the Swints under ERISA and, further, that even if they did have such duties, neither defendant was arbitrary and capricious in

---

**33.** Perhaps significantly, no evidence was introduced evidencing Mr. Swint's payment or nonpayment of premiums for insurance coverage on Roy Ivie following Roy Ivie's nineteenth birthday.

**34.** The court has jurisdiction over the subject matter of this action and over the parties hereto pursuant to 28 U.S.C. §§ 1331, and 29 U.S.C. § 1132(e)(1) & (2).

**35.** In addition, plaintiffs, at trial, appeared to assert that defendants breached their ERISA fiduciary duties by failing to provide a so-called "summary plan description" to Mr. Swint at the time the Policy was established or at anytime thereafter.

its performance or fulfillment of those duties.

Second, the Swints maintain that each defendant violated either their fiduciary obligations under ERISA or the COBRA amendments to ERISA when they failed, following Mr. Swints' notification to them of the occurrence of a qualifying event involving Roy Ivie, to inform either Mr. Swint or Roy Ivie of Roy Ivie's right to elect continuation coverage under COBRA. Implicit in that claim are plaintiff's contentions that Mr. Swint provided Ward with sufficient information from which Ward could determine and, indeed, should have determined, that a COBRA qualifying event had occurred and that Protective Life at least was partially responsible for determining whether a qualifying event had occurred and, consequently, whether a COBRA continuation notice should have been provided to Roy Ivie.

Ward primarily denies that Mr. Swint informed Ward of the occurrence of a qualifying event and, thus, denies that it wrongfully failed to provide Roy Ivie or the Swints of Roy Ivie's notice of his right to elect COBRA continuation coverage. Protective Life, moreover, in addition to adopting the foregoing denials asserted by Ward, strenuously maintains that it has no obligations under the COBRA amendments to ERISA, since those amendments delineate obligations of employers only and impose no express responsibilities on other entities or persons.

Finally and alternatively, plaintiffs assert that Protective Life should be estopped from asserting and/or deemed to have waived its right to deny coverage to Roy Ivie due to its failure to make an adequate inquiry into the issue of Roy Ivie's eligibility for dependant coverage until *after* the period for Roy to elect continuation coverage under COBRA apparently had lapsed. In defense, Protective Life primarily contends that plaintiffs cannot

prove that they relied in any identifiable, tangible manner on Protective Life's alleged failure to conduct a prompt investigation of Roy Ivie's student status and consequent payment of some benefits on Roy Ivie's behalf.

**B. The Statutory Scheme of ERISA and the COBRA Amendments to ERISA**

ERISA, a voluminous, complex piece of legislation, now codified at Chapter 18, Title 29 of the United States Code, *see* 29 U.S.C. §§ 1001–1461, regulates the establishment, operation, and administration of employee welfare and pension benefit plans. "ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans,' *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 90, 77 L.Ed.2d 490, 103 S.Ct. 2890 [2896] (1983), and 'to protect contractually defined benefits,' *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. [134], at 148, 87 L.Ed.2d 96, 105 S.Ct. 3085 [3093]," *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113, 109 S.Ct. 948, 955, 103 L.Ed.2d 80, 94 (1989). *See generally* 29 U.S.C. § 1001.

1. *General Definitions and Obligations.*—In addition to enumerating guidelines for the establishment and administration of employee welfare benefit plans, ERISA contains numerous terms of art and definitions which are of relevance to this action. For example, ERISA defines an "employee welfare benefit plan," in relevant part, as any employer-maintained plan or program established and maintained for the purpose of providing medical, surgical, or hospital care or benefits in the event of sickness, accident, or disability, for its participants [36] or their beneficiaries,[37] through the purchase of insurance or otherwise. 29 U.S.C. § 1002(1). ERISA's coverage extends to, *inter alia, any* employee welfare benefit plan which is established or main-

**36.** The term "participant" is defined, in part, as any employee of an employer, who is eligible to receive a benefit of any type from an employee welfare benefit plan covering employees of such employer, or whose beneficiaries may be eligible to receive such benefit. 29 U.S.C. § 1002(7).

**37.** The term "beneficiary" is defined as "a person designated by a participant, or by the terms of an employee [welfare] benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8).

tained by an employer engaged in commerce or in any industry or activity affecting commerce.[38] 29 U.S.C. § 1003(a). *See also Hoover v. Blue Cross and Blue Shield of Alabama*, 855 F.2d 1538, 1540 n. 2 (11th Cir.1988).[39]

In the case of an employee welfare benefit plan established or maintained by a single employer, the employer is deemed to be the "plan sponsor." 29 U.S.C. § 1002(16)(B).[40] The term "administrator," moreover, is identified as:

(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary [of Labor] may by regulation prescribe.

29 U.S.C. § 1002(16)(A).[41]

ERISA imposes various duties on plan administrators. Of relevance to this action is the requirement that the plan administrator furnish each plan participant and beneficiary with a so-called summary plan description ("SPD"), within 90 days after one becomes a participant or, in the case of a beneficiary, first receives benefits. 29 U.S.C. §§ 1021(a) and 1024(b)(1). A SPD, a copy of which also must be filed with the Secretary of Labor, *see* 29 U.S.C. § 1024(a), is a written document, worded in a manner calculated to be understood by the average plan participant, that summarizes the rights and obligations of participants and beneficiaries under the plan. 29 U.S.C. § 1022(a)(1). A SPD must be "sufficiently accurate and comprehensive" reasonably to apprise participants and beneficiaries of their rights and obligations, *id.*, and must contain, *inter alia,*

[t]he name and type of administration of the plan; the name and address of the person designated as agent for legal process, if such person is not the administrator; the name and address of the administrator; names, titles, and addresses of any trustee or trustees (if they are persons different from the administrator); ... the plan's requirements respecting eligibility for participation and benefits; ... circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided; ... the procedures to be followed in presenting claims for benefits under the plan and the remedies available under the plan for redress of claims which are denied in whole or in part (including

---

**38.** The parties hereto stipulated that Ward, a corporation engaged in business in and affecting commerce, is an "employer" within the meaning of ERISA.

**39.** Protective Life, in an apparent threshold effort to avert liability, urges the court to distinguish between the Plan and the Policy, which was purchased to "fund" the Plan. Protective Life appears to be inviting the court to conclude that the Policy is a mere "asset" of the Plan, and that Protective Life, as a mere provider-for-hire of that "asset," had no duties or responsibilities under ERISA. Protective Life's position, however, is untenable. Where, as here, the Plan consists solely of a group insurance policy purchased by the employer and the sole Plan documents consist of the insurance contract itself, including the master plan, the insurance certificates, and all riders, declarations, and endorsements thereto, the distinction between the Plan and the Policy becomes merely abstract and, ultimately, loses all practical and legal effect.

**40.** Under the terms of ERISA, Ward was the legal sponsor of the Plan.

**41.** The Plan, which, as noted, *supra* p. 548 n. 35, consisted of the Policy documents, did not designate anyone as the Plan administrator. Therefore, under 29 U.S.C. § 1002(16)(A)(ii), Ward is deemed to have been administrator of the Plan.

It is interesting to note that ERISA does not define the term "plan administrator" in the same manner as it defines the term "fiduciary"; that is, ERISA does *not* define the term "plan administrator" by reference to the duties and obligations of said person or entity. Rather, a "plan administrator" generally is a specifically identified person or entity.

It seems reasonable to conclude, based on what acts are not necessary to the definition of a "fiduciary," that a plan administrator is one who performs ministerial or nondiscretionary acts in connection with an employee benefits plan. Under that interpretation of the term, the court concludes that both Ward and Protective Life acted as the co-administrators of the plan and are equally liable for any failure to comply with their administrative duties.

procedures required under [29 U.S.C. § 1133 [42]]).

29 U.S.C. § 1022(b).

Finally and most importantly to this case, a "fiduciary" with respect to an employee welfare benefit plan essentially includes any person [43] who is charged with administration of the plan. 29 U.S.C. § 1002(21)(A). *See also Hoover v. Blue Cross and Blue Shield of Alabama*, 855 F.2d 1538, 1541 (11th Cir.1988). A person is a plan fiduciary to the extent that "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) & (iii). *Cf. Moon v. American Home Assurance Co.*, 888 F.2d 86 (11th Cir.1989).

The duties of a plan fiduciary are described in 29 U.S.C. § 1104(a)(1), which provides, in relevant part, that

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries;

\* \* \* \* \* \*

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; [and]

\* \* \* \* \* \*

(D) in accordance with the documents and instruments governing the plan. . . .

Section 1105(c), 29 U.S.C., allows, in appropriate circumstances,[44] for the allocation of fiduciary responsibilities among named fiduciaries and to persons other than named fiduciaries. Section 1105(a), 29 U.S.C., in fact, provides that "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . .:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with [29 U.S.C. § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

■ Clearly, a person need not be designated in writing as a fiduciary in order so to qualify; nor must the plan sponsor or administrator necessarily serve at all or as the sole plan fiduciary. Indeed, although a particular single-employer plan may have only one sponsor and perhaps even one administrator, the plan may have more than one fiduciary.[45] After all, it is the

---

**42.** Section 1133 provides as follows:

In accordance with regulations of the Secretary [of Labor], every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

**43.** A person, in turn, includes "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9).

**44.** Those circumstances are limited to instances in which "[t]he instrument under which a plan is maintained expressly allows for the allocation of such responsibilities. *See* 29 U.S.C. § 1105(c)(1) & (2).

**45.** That is the case even if the plan expressly designates only one person as the plan fiduciary.

nature and extent of one's designated *or* actual duties and obligations with respect to a plan which determines if one qualifies as a fiduciary.[46]

2. *General ERISA Plan Guidelines.—* As noted, ERISA delineates guidelines for the establishment and administration of employee welfare benefit plans. *See generally* 29 U.S.C. §§ 1101–1145. Under those guidelines, every employee welfare benefit plan must be in writing, with one or more named fiduciaries,[47] "who jointly or severally shall have authority to control and manage the operation and administration of the plan," being expressly designated therein. 29 U.S.C. § 1102(a)(1).

Furthermore, every plan must, *inter alia,* "describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan," including procedures for the allocation of fiduciary responsibilities pursuant to 29 U.S.C. § 1105(c)(1). 29 U.S.C. § 1102(b)(2). Every plan, additionally, *may* provide, *inter alia,* "that any person or group of persons may serve in more than one fiduciary capacity with respect to the plan; ..." 29 U.S.C. § 1102(c)(1).

3. *The COBRA Amendments to ERISA.—*In 1986, Congress enacted the Consolidated Omnibus Reconciliation Act, commonly referred to as COBRA, which, in relevant part, amended ERISA by providing for limited continuation coverage rights under employer-provided group health insurance plans.[48] *See* Gregory, *COBRA: Congress Provides Partial Protection Against Employee Termination of Re-*

*tiree Health Insurance,* 24 San Diego L.Rev. 77 (1987). Passage of the amendment was motivated primarily by a Congressional concern that certain spouses and dependent children abruptly and unwittingly might be deprived of health benefits due to a change in their family status and, secondarily, by the notable *absence* of a federal requirement, corresponding with then-common state-enforced requirements, for the provision of continuation options, under employer-based group health insurance plans, for insurance loss-risk individuals. 1986 *U.S. Code Cong. and Adm.Report* 42, 322. Codified at 29 U.S.C. §§ 1161–67, the amendments require certain employer group health plans to offer qualified beneficiaries an election to continue their group coverage for a period of time following termination of the beneficiaries' eligibility for coverage as group members under the plan.[49] *Id.; Oakley v. City of Longmont,* 887 F.2d 249 (10th Cir. 1989).

Section 1161(a), 29 U.S.C., requires the plan sponsor[50] of each group health plan to provide "qualified beneficiaries," who otherwise would lose coverage under the plan as a result of a "qualifying event," the right under the plan to elect, within the statutory election period, continuation coverage under the plan. A "qualifying event," is an event which, but for the continuation coverage required under ERISA, would result in the loss of coverage of a qualified beneficiary,[51] and includes, *inter alia,* "a dependent child ceasing to be a dependent child under the generally appli-

---

**46.** ERISA imposes express liability for one's breach of one's fiduciary duties. 29 U.S.C. § 1109.

**47.** The term "named fiduciary" means "a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary ... by a person who is an employer.... 29 U.S.C. § 1102(a)(2).

**48.** The term "group health plan" is defined in 29 U.S.C. § 1167(1) as "an employee welfare benefit plan providing medical care ... to participants or beneficiaries directly or through insurance, reimbursement, or otherwise."

**49.** "The coverage must consist of coverage which, as of the time the coverage is being provided, is identical to the coverage provided

under the plan to similarly situated beneficiaries under the plan with respect to whom a qualifying event has not occurred." 29 U.S.C. § 1162(1).

**50.** Section 1161(a) applies to employers employing more than twenty employees. 29 U.S.C. § 1161(b).

**51.** A "qualified beneficiary" is, "with respect to a covered employee under a group health plan, any other individual who, on the day before qualifying event for that employee, is a beneficiary under the plan ... as the dependent child of the employee." 29 U.S.C. § 1167(3)(A)(ii).

cable requirements of the plan." 29 U.S.C. § 1163(5).

The election period under COBRA is defined as the period which:

(A) begins not later than the date on which coverage terminates under the plan by reason of a qualifying event, (B) is of *at least* 60 days' duration, *and* (C) ends not earlier than 60 days after the later of (i) the date [of the qualifying event], *or* (ii) in the case of any qualified beneficiary who receives notice under [29 U.S.C. § 1166(4)], the date of such notice.

29 U.S.C. § 1165(1) [emphasis added].

With respect to the foregoing, COBRA contains certain notice provisions. First, the group health plan, presumably acting through the plan sponsor, is obligated to provide written notice to each covered employee and spouse of the employee, if any, of the continuation rights provided under the COBRA amendments to ERISA. 29 U.S.C. § 1166(a). That notice must be provided at the time coverage commences under the plan. *Id.*

Additionally, 29 U.S.C. § 1166(a)(3) provides, with respect to the occurrence of a qualifying event of the type described in section 1163(5)—that is, when a dependent child ceases to qualify as a dependent under the generally applicable provisions of the plan, that either the covered employee *or* the qualified beneficiary must notify the plan's administrator of the occurrence of the qualifying event within sixty days after the occurrence of the event. 29 U.S.C. § 1166(a)(3). That notification, *which, significantly, is not required to be in or to assume any particular form,* then triggers notification obligations on the part of the plan administrator.

▪ Specifically, upon receiving notification of the occurrence of a section 1163(5) qualifying event, the administrator must notify the qualified beneficiary with respect to such event of such beneficiary's rights under the COBRA amendments to ERISA.[52] 29 U.S.C. § 1166(a)(4)(B). Such notice must be given within fourteen days *of the date on which the administrator is notified of the occurrence of the qualifying event. Id.*

▪ In enacting the COBRA amendments to ERISA, Congress did not attempt to pass a comprehensive statute concerning the right of plan beneficiaries to elect continuation coverage. Indeed, the amendments provide only general guidelines for the provision and exercise of such rights, appropriately reserving resolution of issues concerning their application to administrative (rule-making) agencies and the courts.[53]

▪ On June 15, 1987, the Treasury Department, acting pursuant to statutorily-

---

**52.** The first COBRA notification requirement— that is, the requirement that the plan sponsor provide *each covered employee and spouse, if any, of the employee,* with written notice of their continuation rights under COBRA—does *not* relieve the plan's administrator of this subsequent notice obligation. Indeed, it should not, especially in light of the fact that it is the *qualified beneficiary,* and not the covered employee or the employee's spouse (if different from the qualified beneficiary) who receives that subsequent notice. Theoretically, the notice required to be given by the administrator may be the first indication that the qualified beneficiary receives of his or her right to elect continuation coverage.

**53.** One easily can anticipate the virtually endless factual scenarios giving rise to a person's right to elect COBRA continuation coverage. In light of the myriad circumstances under which such a right might arise, it is perhaps appropriate that Congress did not promulgate exhaustive, inflexible rules concerning one's right to elect such coverage. In this area, where the facts of a particular case are an essential determinant to the resolution of the ultimate issue of liability under COBRA, it is essential that administrative agencies, through their rule-making authority, and courts, in resolving the issues presented in a particular case, be permitted flexibility.

Indeed, in applying COBRA, federal courts should take care to apply equitable principles and fashion remedies to make injured parties whole. *Ingersoll–Rand v. McClendon,* —— U.S. ——, ——, 111 S.Ct. 478, 112 L.Ed.2d 474, 488 (1990). State law, even if preempted, should "remain an important source of policy in crafting federal common law to fill" the void created by the preemption clause of ERISA. *Springer v. Wal–Mart Associates' Group Health Plan,* 714 F.Supp. 1168 (N.D.Ala.1989) (citing *Irish and Cohen, ERISA Preemption: Judicial Flexibility and Statutory Rigidity,* 19 Mich.J. of L. and Reform 109 (1985)).

delegated rule-making authority, *see* 29 U.S.C. § 1204(a), promulgated proposed regulations concerning COBRA continuation coverage, which supplement the COBRA amendments. *See* Treas.Reg. § 1.162–26, 52 Fed.Reg. 22,716 (1987)(to be codified at 26 C.F.R. pt. 1) (proposed Apr. 6, 1987) (the "Treasury regulations"). Although the regulations have not been adopted in final form, they are considered indicative of the Treasury Department's official policies regarding continuation coverage and are given great judicial deference. *See Communications Workers of America v. NYNEX Corp.*, 898 F.2d 887, 888–89 (2d Cir.1990); *Johnson v. Reserve Life Insurance Company*, 765 F.Supp. 1478 (C.D.Cal.1991).[54]

The Treasury regulations, which are set forth in question-and-answer form, contain several provisions of relevance to the present action. The answer to question 33, for example, sets forth the period of time in which a covered employee or qualified beneficiary must inform the employer or plan administrator of the occurrence of a qualifying event. *See* 52 Fed.Reg. at 22,729. If, according to that provision, notice is not *"sent"* to the employer or other plan administrator "within 60 days after the later of (a) the date of the qualifying event, or (b) the date that the qualified beneficiary would lost coverage on account of the qualifying event," notice of the right to elect continuation coverage need not be given.[55]

Upon giving timely notification of the occurrence of a qualifying event, a qualified beneficiary has "60 days *after the later of* (a) the date that the qualified beneficiary would lose coverage on account of the qualifying event, or (b) the date that the qualified beneficiary is sent notice of his or her right to elect COBRA continuation coverage," to elect continuation coverage. *See* Q & A 32, 52 Fed.Reg. at 22,728–29 (emphasis added). "An election is considered to be made on the date that it is *sent* to the employer or plan administrator." *Id.* (emphasis added.)[56] If a timely election is made, continuation coverage then may relate back to the date of the qualifying event. *See* Q & A 34, 52 Fed. Reg. at 22,729.

*4. Civil Enforcement Remedies.*— ERISA makes it unlawful for

> any person to discharge ... or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140.

Section 1132, 29 U.S.C., moreover, grants plan participants and beneficiaries the right to bring civil actions to recover benefits due them under the terms of an ERISA-governed plan, to enforce their rights under the terms of the plan, or to clarify their rights with respect to future benefits under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). Furthermore, that section allows plan participants and beneficiaries to enjoin any act or practice which violates any provision of ERISA, including the COBRA amendments thereto, or the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA. 29 U.S.C. § 1132(a)(3). In such an action the court, in its discretion, may allow a reasonable

---

**54.** The regulations, in fact, are given great deference in this case since (1) the COBRA provisions are within the administrative jurisdiction of both the Treasury and the Labor Department; (2) the Treasury Regulations apply to the substantive issues involved; and (3) the Treasury Department's construction of the COBRA amendments is reasonable. *See Johnson v. Reserve Life Insurance Company,* 765 F.Supp. 1478 (C.D.Cal.1991).

**55.** The terminology used—that is, that notice must be "sent"—appears to anticipate and, indeed, require written notification of the occurrence of a qualifying event. The Treasury regulations, however, do not explicitly require written notification.

**56.** Although the regulation uses the word "sent" in reference to the qualified beneficiary's notice of election, thus implying that the notice must be in writing, the regulation does *not* require or so imply that the notice to the employer or plan administrator of the occurrence of a qualifying event must be in writing.

attorney's fee and costs of the action to either party. 29 U.S.C. § 1132(g)(1). *See Nachwalter v. Christie,* 805 F.2d 956, 961 (11th Cir.1986).

## C. Discussion

1. *Breach of Fiduciary Obligations by the Defendants.*—In assessing plaintiffs' first claim—that is, their claim that both Ward and Protective Life breached fiduciary obligations imposed by ERISA, the court must determine: (1) whether Ward and/or Protective Life were fiduciaries under the Policy and within the meaning of ERISA; (2) if one or both were fiduciaries, the extent to which one or both were relegated and exercised fiduciary duties in this case; (3) the appropriate standard for assessing the fulfillment of, or failure to fulfill, those duties; and (4) whether, under the applicable standard of review, the duties were breached.[57]

■ As noted, the Plan not only expressly designated Ward as the " 'named fiduciary' for claims review required by ERISA," but also relegated discretionary duties to Ward, commensurate with that title. Specifically, Ward was charged with at least some degree of responsibility for determining a person's eligibility for coverage under the Policy, one of the most important, fundamental determinations to be made in connection with the administration of any plan. Ward, thus, clearly qualified as a "fiduciary" within the meaning of ERISA. *See* 29 U.S.C. § 1002(21)(A).

■ Protective Life, although not so designated in the Policy, also qualified as an ERISA fiduciary. The terms of the Policy, as noted, *infra* page 6, expressly stated that claimants were to "give claims to Employer who will *verify insurance status* and file them with us," thus clearly charging Ward with responsibility for determining eligibility for coverage. The Policy, however, reserved to Protective Life responsibility for examining, processing, and paying all claims which *Protective Life* "decided" were payable. Although the scope of authority granted by that language was unclear, according to Protective Life's employees, that language not only reserved to Protective Life responsibility for assessing and paying claims in accordance with the Policy's provisions—a relatively mechanical, non-discretionary act—, but also granted Protective Life ultimate authority to determine eligibility. Protective Life, in fact, relied on that language when making the determination of ineligibility for coverage in this case.[58]

■ In the court's opinion, inherent in the authority for determining eligibility is the responsibility for determining whether one is eligible for coverage under a COBRA continuation policy. The COBRA endorsement to the Policy and, in fact, the COBRA amendments themselves relegated such authority to Ward. Protective Life employees, however, clearly asserted that *Protective Life* ultimately was responsible for making that determination and, in fact, made the determination of ineligibility in this case.[59] Those facts lead the court to the inevitable conclusion that the fiduciary duties of Ward and Protective Life encompassed that eligibility assessment.

Having thus determined that both Ward and Protective Life acted as ERISA fiduciaries in determining eligibility for coverage under the Policy and under the COBRA amendments to ERISA, the court next must determine the appropriate standard

---

**57.** Of additional relevance to this case is whether a breach, if any, by one or both of these defendants proximately caused injury to the plaintiffs. The court must postpone consideration of damages until after the court has conducted a separate hearing on the damages issues.

**58.** The court is not impressed with Ward's argument that Protective Life totally usurped any discretionary authority that was relegated to Ward under the Policy. In the court's opinion, Ward and Protective Life were co-fiduciaries

under the Plan, each having been granted and having exercised substantial authority for determining eligibility.

**59.** Protective Life's partial usurpation of Ward's authority is exemplified by Zeviernik's implicit rejection of Sturdivant's apparent suggestion that Protective Life take into consideration the timing of Roy Ivie's accident vis-a-vis COBRA in determining, whether Roy Ivie was eligible for coverage under the Policy.

under which the court must assess the fiduciaries' actions in this case. Until relatively recently, it was well established that the actions of a plan fiduciary would be sustained as a matter of law unless a plaintiff proved that such actions were arbitrary and capricious. *See Hoover v. Blue Cross and Blue Shield of Alabama,* 855 F.2d 1538, 1541 (11th Cir.1988); *Moon v. American Home Assur. Co.,* 888 F.2d 86, 88 (11th Cir.1989).

▪ In *Firestone Tire & Rubber Company v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), however, the United States Supreme Court unanimously held that in the absence of a clearly expressed grant by the plan to the administrator or plan fiduciary of discretionary authority to construe uncertain terms of the plan, federal courts, in reviewing a fiduciary's actions in an action brought under 29 U.S.C. § 1132(a)(1)(B), should employ a *de novo* standard of review. The court further essentially concluded that trial courts could determine and assess fiduciary obligations by looking to the terms of the plan and other manifestations of the parties' intent. *Firestone,* 489 U.S. at 112–13, 109 S.Ct. at 955–56, 103 L.Ed.2d at 93–94.[60]

▪ The plan in the instant case fails to contain such a clear grant of discretion involving the construction by either Ward or Protective Life of terms necessary to the determination of eligibility for cover-

age.[61] Therefore, a *de novo* review of the decisions made by Ward and Protective Life relative thereto is appropriate.[62]

▪ Reviewing *de novo* the actions of Ward and Protective Life with respect to the determination of Roy Ivie's eligibility for coverage under either the Policy or the COBRA amendments to ERISA, it is abundantly clear that both Ward and Protective Life violated their fiduciary obligations to the plaintiffs in several respects. Each defendant had an independent obligation to verify Roy Ivie's insurance coverage once each received notification, whether oral or written, of Roy Ivie's accident. As part of that obligation, each had an *independent* duty promptly and fully to investigate Roy Ivie's student status.

Presented on the Monday following Roy Ivie's accident with information which clearly indicated that Roy Ivie, immediately prior to the accident, was not attending school full-time, as required for eligibility under the Policy, Ward had a duty at that time to make a prompt reasonable investigation into Roy Ivie's school status. Diligent efforts on the part of Ward would have revealed that Roy Ivie, indeed, was not a full-time student. That revelation, in fact, easily could have been made well within the minimum sixty-day period allowed under COBRA for electing continuation coverage. Ward's failure to investigate, coupled with its ultimate, incorrect

---

**60.** It is clear from ERISA's legislative history and from cases decided pursuant to ERISA, that Congress, in adopting ERISA, intended to codify and make applicable to ERISA fiduciaries certain principles developed in the evolution of the law of trusts. *Firestone,* 489 U.S. at 110–14, 109 S.Ct. at 953–56, 103 L.Ed.2d at 92–95. Hence, the plaintiffs' rights are protected by both equitable principles drawn from the law of trust and more traditional standards applicable to the resolution of disputes between insurers and their insureds.

**61.** In so concluding, it is important to note that the assessment of discretion for purposes of determining whether one qualifies as a fiduciary is distinct from that for determining the appropriate standard of review of a fiduciary's performance of discretionary acts. With respect to the former, ERISA expressly defines a fiduciary as one who "has any discretionary authority or discretionary responsibility in the

administration" of the Plan. 29 U.S.C. § 1002(21)(A)(i). The court interprets that definition to qualify as fiduciaries those, *inter alia,* who make decisions regarding fundamental rights under a Plan.

The latter assessment concerns the extent to which one has the discretion or subjective or interpretive latitude to make decisions concerning fundamental rights. In this case, for example, Protective Life had the authority, under the terms of the Policy, to make decisions regarding eligibility for coverage. It exercised that authority, however, with relatively little discretion—that is, it made that determination by applying the terms of the Policy to the fact situation presented.

**62.** Even if the plan did contain such a clear grant of discretion, the court is satisfied that, under the facts of the instant case, the degree of deference warranted is so small that *de novo* review is appropriate.

determination that Roy Ivie was a "full-time" student, contributed proximately to the denial of coverage to Roy Ivie.

Protective Life, too, violated its duty promptly to investigate Roy Ivie's eligibility for coverage. As noted, both Ward and Protective Life had an *independent* duty to conduct a reasonable, prompt investigation. Having interpreted the Policy as granting it the authority to make eligibility determinations and actively having embraced that responsibility, Protective Life had a duty to "start from square one" in its assessment of a plan participant's or plan beneficiary's eligibility. It could not discharge that obligation, as it attempted to do in this case, simply by relying on information obtained from Ward.

Protective Life's duty to investigate, moreover, was triggered when Protective first received notice of Roy Ivie's accident—that is, when Doss telephoned Sweatt the Monday following the accident. As with Ward, diligent efforts on the part of Protective Life would have revealed that Roy Ivie, indeed, was not "attending school full-time, as Protective Life interpreted that phrase. That revelation, in fact, easily could have been made well within the minimum sixty-day period allowed under CO-BRA for electing continuation coverage.

Ward and Protective Life, moreover, breached their fiduciary duties under ERISA by failing to recognize that Roy Ivie made a timely election to receive CO-BRA continuation coverage. Had Ward and Protective Life duly investigated Roy Ivie's student status, they would have discovered, within the period of time allowed for a COBRA election, that Roy was not attending school full-time at the time of the accident and, thus, was not eligible for benefits under the Policy. Any reasonable plan fiduciary, given those facts, would have to conclude that Roy Ivie, who was unable to act for himself, would elect to receive COBRA continuation coverage and would have performed all acts necessary to secure such coverage. By not acknowledging that the facts relevant to a correct determination of Roy Ivie's student status were available within the minimum period required for an election and, instead, by resting on the assertion that Roy Ivie's period of election had expired by the time Protective Life and Ward first made a sufficient investigation to determine, in early 1988, that Roy Ivie was not attending school full-time at the time of the accident, Ward and Protective Life completed abdicated their fiduciary responsibilities.[63]

Indeed, the evidence clearly established that the defendants had prevalent concerns about the applicability of COBRA to Roy Ivie's case, concerns which openly were discussed among nearly all of the principal actors in this case. Notwithstanding those concerns, the Swints never were informed about the possible applicability of COBRA to this case. The failure of the defendants to give the Swints and Roy Ivie notice after themselves being put on notice of the facts which raised the issue of Roy Ivie's lack of eligibility warrants the entry of judgment against the defendants.[64]

**63.** It is undisputed that both Ward and Protective Life had actual knowledge before October 3, 1987, of the following facts: (1) that Roy Ivie was nineteen years old; (2) that Roy Ivie had been involved in a serious motor vehicle accident and was in a coma and badly injured; and (3) that Roy Ivie needed medical attention and wanted insurance coverage. There could not have been a more clearly stated expression of the desire of the Swints to continue whatever insurance coverage was available for Roy Ivie at that period of time than the approach made by Mr. Swint to Doss and Sturdivant, seeking help, assistance, and insurance in dealing with Roy Ivie's medical needs. COBRA requires a qualified beneficiary to give notice of a qualifying event but does not require any magic words. The information given to Ward by Mr. Swint was sufficient to activate Ward's obligation to provide the plaintiffs with an explanation of their COBRA rights and an election form.

**64.** Plaintiffs urge the court to conclude that Ward's failure, either in the scope of its duties as plan administrator or plan fiduciary, to provide plaintiffs with a SPD, constituted a violation of ERISA triggering liability in this case. Although undoubtedly Ward's failure to fulfill its express statutory obligation was wrongful and, most likely, led to confusion as to the rights available under the Policy, the court declines to conclude that Ward's failure alone justifies a judgment in favor of the plaintiffs in this case.

2. *Violation of the COBRA Amendments to ERISA.*—In assessing plaintiffs' claim that each of the defendants violated the COBRA amendments to ERISA, the court must determine the following: (1) on whom the amendments imposed obligations in this case; and (2) assuming that the amendments imposed obligations on either defendant, whether either one violated those amendments. As part of the foregoing inquiry, the court must determine whether Mr. Swint properly notified Ward of the occurrence of a qualifying event, thus triggering Ward's, and perhaps Protective Life's, duties under the statute.

It is clear in this case: (1) that COBRA continuation coverage was offered in an endorsement to the Policy, (2) that Roy Ivie was eligible for coverage and was covered under the Policy, at least until August 4, 1987; (3) that a "qualifying event," as defined in COBRA, occurred on August 4, 1987, the date Roy Ivie turned nineteen, since, as of that date, Roy Ivie, who was not then attending school full-time, no longer was eligible for coverage under the Policy; (4) that Roy Ivie was injured on the forty-fifth day following his birthday; and (5) that both Ward and Protective Life had notice of Roy Ivie's accident within sixty days after Roy Ivie's nineteenth birthday.

COBRA imposes express notice obligations on plan sponsors and administrators and, as previously noted, retention in a Plan document of authority to make determinations critical to the exercise of one's COBRA rights may trigger obligations on the part of a plan fiduciary. In the case of a qualified beneficiary who is a dependent child, those notice obligations do not arise until the employee or the qualified beneficiary gives "notice" to the plan sponsor of the occurrence of a qualifying event.

Neither the COBRA amendments nor the COBRA endorsement provided to Ward employees in this case specifies the form in which notice of a qualifying event must be given. Furthermore, the Treasury regula-tions, referred to previously, are silent on that point.

In the court's opinion, COBRA requires the giving of sufficient information, by either an employee or a qualified beneficiary, of the occurrence of a qualifying event from which one, upon due inquiry, reasonably can ascertain that a qualifying event has occurred. Such an equitable interpretation of COBRA is consistent with and, in fact, promotes the statutory objective of preserving and protecting the rights of plan participants and beneficiaries, while not placing unduly burdensome or unreasonable obligations on plan sponsors or administrators.

The court further holds that Mr. Swint conveyed such sufficient information to Doss the Monday following the accident. Mr. Swint, when asked about Roy Ivie's student status, stated that Roy had not passed the twelfth grade but had enrolled in a course to graduate. Upon merely comparing that information with the Policy's relevant provisions, Doss readily could have ascertained that Roy was *not* a full-time student, that Roy was not eligible for coverage under the Policy, and that a qualifying event had occurred.

Having received timely notice of the occurrence of a qualifying event, Ward's notification obligations, as administrator of the Plan, were triggered. Specifically, Ward had a duty to notify *Roy Ivie*, as the qualified beneficiary, of his right to elect COBRA continuation coverage. Ward was obligated to give that notice within fourteen days of receiving notice of the occurrence of the qualifying event, but it utterly failed to do so.[65] Having failed to satisfy its obligations timely, and it being reasonable to assume that Roy Ivie would have elected COBRA continuation coverage had he properly been informed of his right to do so, Roy Ivie is deemed to have made an election, and Ward is thus charged with liability.

---

**65.** Even if one assumes that the notice obligation was tolled during the period of time Roy Ivie remained incompetent and without a legal guardian (that is, until December 18, 1987), Ward failed to satisfy its notice obligation.

■ In the court's opinion, Protective Life, while not liable under the express terms of COBRA, contractually is bound to provide Roy Ivie with COBRA continuation coverage by virtue of Ward's failure to perform its notice obligations. In addition and alternatively, Protective Life is obligated to provide such coverage by virtue of its violation of its fiduciary obligations under the Plan. *See supra* at pages 555–557.

■ 3. *Waiver/Estoppel.*—In addition to the foregoing, the court concludes that Protective Life should be estopped from denying coverage under the Policy or under the COBRA amendments to ERISA. Alternatively, Protective Life, in the court's opinion, has waived its right to deny coverage.

The doctrine of equitable estoppel generally is applicable in actions brought pursuant to ERISA, including the COBRA amendments thereto. *See National Companies Health Benefit Plan v. St. Joseph's Hospital,* 929 F.2d 1558 (11th Cir.1991). To prevail on a claim for equitable estoppel under federal common law, the plaintiff must prove that

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Id.* at 1572.[66]

Plaintiffs have satisfied that burden in this case. With respect to the first element, the evidence demonstrated that Protective Life and Ward concealed from the plaintiffs the fact that Roy Ivie was eligible to make a COBRA election. Indeed, the defendants, though on notice of the serious nature of Roy Ivie's injuries and having discussed between themselves the possibility that Roy might be eligible for continuation coverage, never once informed the plaintiffs that Roy Ivie was eligible to make an election.

The defendants, moreover, actively misrepresented to the Swints that Roy's enrollment in a correspondence course qualified him for coverage. Prior April 1988, Protective Life's agent, Duke, actively represented that Roy was covered and that Protective Life would "stand by" the Swints. These representations were made notwithstanding, *inter alia,* Protective Life's receipt, on January 26, of the letter from George County High School.

Protective Life certainly intended that the plaintiffs should rely on its misrepresentations. Undoubtedly, the plaintiffs would have made a COBRA election if the defendants had made a disclosure concerning Roy's potential rights under COBRA, potential coverage problems, and Protective Life's undisclosed position that Roy was ineligible for coverage under the policy.

The fourth element, that the party asserting estoppel neither knew nor should have known the true facts, also is present. The Swints were unaware of Roy Ivie's rights to continuation coverage, notwithstanding the alleged provision to them in March and May 1987, of general information concerning COBRA continuation rights.

Finally, the element of reasonable and detrimental reliance, if indeed required, is present.[67] Clearly, the plaintiffs would have made any sacrifice to assist their son.

---

**66.** Estoppel, moreover, also can occur through "an intentional deception through concealment or inaction, or gross negligence amounting to constructive fraud." *Id.* at 1572–73, n. 14.

**67.** In *Branch v. G. Bernd Company,* 764 F.Supp. 1527 (M.D.Ga.1991), the District Court rejected the necessity that actual reliance be present. The Court held that the failure of the plan fully to comply with the statutory requirements of ERISA regarding the preparation and distribution of a summary plan description foreclosed the defendants from relying upon the terms of the plan to deny benefits. The court held that unlike a party invoking the doctrine of equitable estoppel, a Plaintiff who seeks to enforce the terms of a summary plan description need not prove detrimental reliance in order to recover.

The Swints, moreover, failed to make an election for COBRA continuation coverage as a direct and proximate result of the lack of information ERISA obligated the Defendants to provide.

Protective Life, alternatively, has waived its right to deny coverage to Roy Ivie under the Policy. Waiver is the voluntarily, intentional relinquishment of a known right. 16B Appleman, *Ins. Law and Practice*, § 9081 at 489. Where an insurer, with knowledge of facts vitiating a policy, by acts, declarations, or dealings leads an insured to believe that he or she is protected under the policy, such acts, transactions, or declarations operate as a waiver of the forfeiture and preclude the insurer from relying thereon as a defense to a suit on the policy. *Id.* at p. 504. If the insurer had knowledge of facts which would put a reasonable man on inquiry, or which, if pursued, would give the company actual knowledge of the circumstances, and it failed to make such inquiry or to pursue such facts, it will deemed to have waived its rights. *Id.*, p. 547, at n. 27.[68]

Protective Life had ample opportunity, as well as a duty, to investigate the merits of Roy Ivie's eligibility and claim prior to paying benefits.[69] Instead, Protective Life did not conduct a prompt investigation and, instead, paid benefits and continued to pay benefits, even after it was fully informed of Roy Ivie's student status. The initial confusion over Roy Ivie's true student status was directly resulted from Protective Life's failure to make a proper investigation. The Plaintiffs relied on the representation of coverage made by Protective Life by incurring expenses, working and preparing to move their son to a medical facility recommended by Protective Life's medical review coordinator, and failing to tender COBRA continuation premiums.

The evidence in this case established that Protective Life initially determined Roy Ivie to be eligible as a student and realized that even if he was not a student, that because his accident had been suffered and notice thereof given to his employer within the COBRA election period, he was entitled to coverage. Many months later Protective Life, when faced with the probability that they would have to file a claim with their excess insurance carrier, who required written proof of coverage, and apparently believing that it could challenge Roy Ivie's eligibility with impunity, Protective Life "changed its corporate mind." In the meantime, Protective Life, after failing to make a reasonable investigation into the coverage issue, harbored crucial information from the Swints (that is, that there was some question as to whether Roy Ivie had COBRA continuation rights), yet paid over $80,000.00 in benefits on Roy's behalf. Protective Life's conduct amounts to a knowing relinquishment of the right to deny coverage based on Roy Ivie's alleged failure to meet the definition of a "full-time student [sic]". *See McLaughlin v. Connecticut Gen. Life Ins. Co.*, 565 F.Supp. 434 (N.D.Ca.1983).

### Conclusion

In light of the foregoing discussion, the court concludes that judgment is due to be entered in favor of the plaintiffs, and against the defendants, on the liability issues. It is the court's present intention to grant the parties leave to take an interlocutory appeal from the foregoing ruling, prior to holding a hearing on the damages issues. The court, however, as noted at the conclusion of the hearing on the liability issues, is contemplating making a limited award of undisputed damages prior to

---

**68.** Where an investigation by an insurance company develops facts justifying an avoidance of coverage, the insurer cannot, without waiving such defense, proceed as though the policy were valid. *16C Appleman, Ins. and Practice*, sec. 9361.25 at n. 7, citing *Travelers Indem. Co. v. Harris*, 216 F.Supp. 420 (D.C.Mo.1963) and *American Ins. Co. v. Millican*, 153 So. 448, 26 Ala.App. 31, certiorari denied 153 So. 454, 228 Ala. 357.

**69.** An "implied covenant good faith and fair dealing requires an insurance company to investigate thoroughly its insured's claims" and the failure to do so waives the right to rely on "any other grounds which a reasonable investigation would have uncovered." *McLaughlin v. Connecticut General Life Insurance Co.*, 565 F.Supp. 434 (N.D.Ca.1983).

granting the parties an interlocutory appeal. The parties are hereby ORDERED to file brief with the court, within twenty (20) days from the date of this order, which specify those "undisputed" damages which they believe to be recoverable at this time.